1
2
3
4
5
6
7
8                     UNITED STATES DISTRICT COURT
9                   SOUTHERN DISTRICT OF CALIFORNIA
10

11   CECILIA BACH, individually and as        Case No.:  24-cv-1687 W (DTF)
     Successor in Interest to the ESTATE OF
12   MR. KEITH BACH,                           ORDER GRANTING IN PART AND
                                               DENYING IN PART (1) NAPHCARE
13                              Plaintiff,      INC.'S MOTION TO DISMISS
                                               [DOC. 10] AND (2) THE COUNTY
14   v.                                         DEFENDANTS' MOTION TO
                                               DISMISS [DOC. 11]
15   COUNTY OF SAN DIEGO, et al.,
16                              Defendants.
17
18

19        Pending before the Court are two motions to dismiss Plaintiff's First Amended

20   Complaint ("FAC" [Doc. 9]) under Federal Rule of Civil Procedure 12(b)(6) by

21   NaphCare, Inc. and the County of San Diego, Kelly A. Martinez, Rich Williams and Dr.

22   Jon Montgomery, D.O. (collectively, the "County Defendants"). Plaintiff opposes both

23   motions.

24        The Court decides the matter on the papers submitted and without oral argument.

25   *See* Civ.L.R. 7.1(d)(1).  For the following reasons, the Court **GRANTS IN PART** and

26   **DENIES IN PART** NaphCare's motion to dismiss [Doc. 10] and the County

27   Defendants' motion to dismiss [Doc. 11].

28

                                      1

# I.    FACTUAL BACKGROUND

Because the complaint's factual allegations are assumed true on a motion to dismiss, the following factual background is taken from the FAC.

## A.    The Parties

Plaintiff Cecilia Bach brings this lawsuit individually as the wife of decedent Keith Bach and as the successor-in-interest to his estate. (*FAC* [Doc. 9] ¶¶ 7, 8.) At the time of his death, Mr. Bach was 63 years of age and in custody at the San Diego County Central Jail ("SDCJ"). (*Id.* ¶ 21.) The San Diego County Medical Examiner ruled Mr. Bach's death a homicide. (*Id.*)

Defendant County of San Diego (the "County) operates and manages the SDCJ. (*FAC* ¶ 9.) Defendants Sheriff Kelly A. Martinez and Undersheriff Rich Williams are final policymakers for the Sheriff's Department and County on matters relating to the SDCJ, its deputies, employees, and agents at the time of Mr. Bach's death. (*Id.* ¶¶ 10–11.) Defendant Dr. Jon Montgomery, D.O., the Sheriff's Department's Chief Medical Officer, is also a final policymaker, responsible for and overseeing all medical doctors and medical staff at the SDCJ, and in charge of the procedures related to inmates' medical care. (*Id.* ¶ 12.)

Defendant NaphCare, Inc. is a third-party contractor providing medical services to the San Diego County Sheriff's Department since at least June of 2022. (*FAC* ¶ 13.) At the time of Mr. Bach's death, NaphCare and its medical staff were responsible for providing on-site medical services to detainees in the SDCJ, including Mr. Bach. (*Id.*) Naphcare employed, supervised, and/or trained "Medical Provider Does 1–25," who were also "County employees, agents, or contractors working within the Sheriff's Department Medical Services Division who were responsible for Mr. Bach's medical care, booking, follow-up assessments, and referrals for further treatment. . . ." (*Id.* ¶¶ 14, 15.)

The FAC also names "Deputy Does 26–50" and "Deputy Supervisor Does 51–75." (*FAC* ¶¶ 15–17.) The Deputy Does are the "Sheriff's deputies who were responsible for

2

summoning medical care, observing any audio or video monitors, responding to call buttons, feeding detainees and/or conducting wellness checks on [Mr. Bach]." (*Id.* ¶ 16.) The Deputy Supervisor Does were responsible for training and supervising the Deputy Does.[1] (*Id.* ¶ 17.)

### B.    <u>Mr. Bach Dies from Diabetic Ketoacidosis</u>

At the time of his death, Mr. Bach was a 20-year veteran of the U.S. Military and was married to Plaintiff Cecilia Bach. (*FAC* ¶ 22.) He was diabetic and for years successfully managed his diabetes with a MiniMed continuous glucose monitor and insulin pump that administered fast-acting insulin. (*Id.* ¶ 23.)

On September 25, 2023, Mr. Bach was arrested by the Chula Vista Police Department. (*FAC* ¶ 24.) Before being booked into SDCJ, he was taken to Scripps Mercy Hospital for medical clearance. (*Id.* ¶ 26.) A notation on a document the doctors provided to "Defendants" indicated that Mr. Bach's insulin pump needed to be refilled. (*Id.* ¶ 28.)

While being booked into SDCJ, Mr. Bach's glucose levels were elevated and his insulin pump was beeping, indicating it needed to be refilled. (*FAC* ¶ 27.) At some point he "experienced a syncopal episode and was transported . . . in an ambulance back to Scripps Mercy Hospital Emergency Department." (*Id.* ¶ 29.) Mr. Bach was admitted at 10:40 p.m. and released at 2:04 a.m. (*Id.* ¶ 31.) Mr. Bach's medical records also indicated he had type-1 diabetes and required a glucose monitor and insulin pump. (*Id.* ¶ 32.)

At 4:00 a.m., Mr. Bach notified Medical Provider Doe 1, who was the nurse practitioner performing his initial intake at SDCJ, that his insulin pump would be depleted of insulin in approximately 28 hours. (*FAC* ¶ 33.) At 12:00 p.m., Mr. Bach was evaluated by Medical Provider Doe 2, a second nurse practitioner employed by NaphCare, who placed an order for 10 units of insulin, three times a day. (*Id.* ¶ 34.)

---

[1] Although initially referred to as Deputy Supervisor Does, the FAC also refers to these defendants as Supervisor Deputy Does. (*See e.g.*, *FAC* ¶¶ 68–80.)

However, Mr. Bach was only given 10 units of insulin at 4:43 p.m. (*Id.* ¶ 35.) As a result, by 1:17 a.m. on September 27, Mr. Bach's blood glucose level was 322 mg/dL, and he repeatedly requested 20 more units of insulin. (*Id.* ¶ 36.) At 1:51 a.m., he was given 10 units of insulin, which was his last dose before he died on September 28. (*Id.* ¶ 37.)

From 2:00 a.m. to 9:00 p.m. on September 27, Mr. Bach was not seen by a medical provider. (*FAC* ¶ 38.) During this time, he asked several Deputy Doe defendants for insulin, but his requests were ignored. (*Id.*) In addition, other inmates around Mr. Bach attempted to assist him by requesting insulin and pointing out to the Deputy Does and Deputy Supervisor Does that Bach's insulin pump was beeping and empty. (*Id.*)

During mealtimes on September 27, 2023, Mr. Bach gave his food to fellow inmates because he did not want to eat without access to insulin. (*FAC* ¶ 39.) Additionally, during mealtimes, Mr. Bach and other inmates alerted Deputy Does and Deputy Supervisor Does that Mr. Bach needed insulin. (*Id.*)

Meanwhile, Cecilia Bach continued to receive notifications that Mr. Bach's insulin pump was empty. (*FAC* ¶ 41.) She therefore frantically visited the jail multiple times to deliver insulin to her husband but was told by County and NaphCare employees that he would be taken care of by the SDCJ medical staff and deputies. (*Id.*) Contrary to these statements, on September 28, 2023, at 03:38 a.m., Mr. Bach was discovered dead in his cell with glucose levels exceeding 500 ml/dL. (*Id.* at ¶ 40.) According to the County's Deputy Medical Examiner:

> Based on the autopsy findings and the circumstances surrounding the death, as currently understood, the cause of death is diabetic ketoacidosis due to type 1 diabetes mellitus with hypertensive and atherosclerotic cardiovascular disease as a contributing condition. Review of outpatient medical records clearly indicates that Mr. Bach had demonstrable knowledge in managing his diabetes; however, as an inmate, he became reliant on the medical services provided by the jail for continued management of his condition. Following insufficient insulin administration while in custody, Mr. Bach developed diabetic ketoacidosis and died. This occurred despite medical records containing documentation of his medical condition, insulin requirements, when his pump would be depleted of insulin, and multiple

4

unanswered requests for insulin by Mr. Bach and fellow inmates. The death is due to complications of a natural disease. However, considering the inaction (i.e., neglect) characterizing the events leading to inadequate care while incarcerated of Mr. Bach's health conditions and ultimately, his death, the manner of death is classified as homicide.

(*Id.* ¶ 47.)

### C. **Ms. Bach Files this Lawsuit**

On September 20, 2024, Ms. Bach filed this lawsuit. On December 6, 2024, Ms. Bach filed the FAC alleging the following causes of action: (1) Deliberate Indifference to Serious Medical Needs under 42 U.S.C. §1983; (2) Wrongful Death under 42 U.S.C. §1983; (3) Right of Association under 42 U.S.C. §1983; (4) Failure to Properly Train and Supervise under 42 U.S.C. §1983; (5) *Monell* Municipal Liability under 42 U.S.C. §1983; (6) Failure to Summon Medical Care, Cal. Gov Code §845.6; (7) Wrongful Death & Survival Action, CCP §§ 377.30, 377.60 *et seq*.; (8) Negligence; and (9) Bane Act, Cal. Civ. Code §52.1. The County Defendants and NaphCare, Inc. now move to dismiss.

## II. LEGAL STANDARD

The Court must dismiss a cause of action for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint. *See Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). A complaint may be dismissed as a matter of law either for lack of a cognizable legal theory or for insufficient facts under a cognizable theory. *Balisteri v. Pacifica Police Dep't.*, 901 F.2d 696, 699 (9th Cir. 1990). In ruling on the motion, a court must "accept all material allegations of fact as true and construe the complaint in a light most favorable to the non-moving party." *Vasquez v. L.A. Cnty.*, 487 F.3d 1246, 1249 (9th Cir. 2007).

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has

24-cv-1687 W (DTF)

interpreted this rule to mean that "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007). The allegations in the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). Although well-pled allegations are assumed true, a court is not required to accept legal conclusions couched as facts, unwarranted deductions, or unreasonable inferences. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

## III.   ANALYSIS

### A.   The Section 1983 Causes of Action

The FAC asserts five section 1983 causes of action. The parties raise a number of challenges to each cause of action.

#### 1.   *Acting under color of state law*

NaphCare argues that the section 1983 causes of action must be dismissed because it was not acting under color of state law.

To state a claim for violation of 42 U.S.C. § 1983, a plaintiff must plead facts demonstrating that (1) his constitutional rights were violated and (2) that defendants were acting under color of state law. *Long v. Cnty of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)). Regarding the state-action prong, "[p]rivate persons, jointly engaged with state officials in the challenged action, are acting 'under color' of law for purposes of § 1983 actions.'" *DeGrassi v. City of Glendora*, 207 F.3d 636, 647 (9th Cir. 2000) (quoting *Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980)). The "determination of whether a nominally private person or corporation acts under color of state law 'is a matter of normative judgment, and the criteria lack rigid simplicity." *Pasadena Republican Club v. W. Just. Ctr*, 985 F.3d 1161, 1167 (9th Cir. 2021) (quoting *Rawson v. Recovery Innovations, Inc.*, 945 F.3d 742, 747 (9th Cir. 2020) (internal citation

6

omitted)). "Courts must engage in 'sifting facts and weighing circumstances' to answer what is 'necessarily a fact-bound inquiry.'" *Id.* (quoting *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 939 (1982)).

There are four tests used to identify when a private party has acted under color of state law: (1) public function; (2) joint action; (3) governmental compulsion or coercion; and (4) governmental nexus. *Rawson*, 945 F.3d at 747. Regardless of the test used, "[a]t bottom, the inquiry is always whether the defendant has exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Id.* at 747–748.

In *West v. Atkins*, 487 U.S. 42 (1988), the Supreme Court evaluated whether a physician under contract to provide medical care to inmates at a correctional facility acts under "color of state law." *Id.* at 43. The Court concluded that because the "delivery of medical treatment" to someone in custody is "state action fairly attributable to the State," the medical professional acts "under color of state law for purposes of § 1983." *Id.* at 57.

Here, the FAC alleges that NaphCare entered a contract to provide "medical services to the San Diego County Sheriff's Department" beginning in June 2022 and that it "was responsible for providing medical care staffing and [on]-site medical services to detainees in the SDCJ." (*FAC* ¶ 13.[2]) The factual allegations also demonstrate that Medical Provider Doe 1 and 2, which are alleged to be NaphCare's employees, provided medical services at the SDCJ to Mr. Bach. (*Id.* ¶ 14.) Specifically, Medical Provider Doe 1 conducted Mr. Bach's initial assessment, and Medical Provider Doe 2 evaluated Mr. Bach on September 26 and placed the order for ten units of insulin, three times a day. (*Id.*

---

[2] NaphCare contends Plaintiff mischaracterizes the nature of its services in that "the majority of NaphCare employees are remote, providing supplemental telehealth services in support of the onsite healthcare providers and nursing staff who are not NaphCare employees." (*NaphCare Reply* [Doc. 21] 11:8–12.) On a motion to dismiss, the Court must accept the facts alleged in the FAC, none of which support NaphCare's contention. Instead, the FAC's allegations give rise to a reasonable inference that NaphCare's employees included the onsite Medical Provider Does who examined Mr. Bach.

¶¶ 33, 34.) Based on these allegations, the FAC sufficiently alleges NaphCare and its employees were acting under color of state law.

### 2.    *Qualified Immunity*

NaphCare argues it is entitled to qualified immunity for the section 1983 causes of action. Qualified immunity shields government officials from liability for monetary damages unless the plaintiff establishes that (1) the conduct violated a constitutional right, and (2) the right was "clearly established" when the misconduct occurred. *Pearson v. Callahan*, 555 U.S. 223, 232, 236–42 (2009) (modifying the two-step inquiry in *Saucier v. Katz*, 533 U.S. 194 (2001), to allow courts discretion in deciding which prong to address first depending on the facts of the case). "Clearly established" means "[t]he contours of the right must be sufficiently clear that a reasonable official would understand what he is doing violates that right" with careful consideration to the facts of the particular case. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In determining whether a right is clearly established, courts "may look at unpublished decisions and the law of other circuits, in addition to Ninth Circuit precedent." *Prison Legal News v. Lehman*, 397 F.3d 692, 702 (9th Cir. 2005); *Sorrels v. McKee*, 290 F.3d 965, 970 (9th Cir. 2002) (looking to "decisions of our sister Circuits, district courts, and state courts" in evaluating if law was clearly established).

The Court will evaluate each of the five section 1983 causes of action separately.

### (a)    First cause of action - deliberate indifference to serious medical needs in violation of the 14th Amendment

The first section 1983 cause of action alleges deliberate indifference to Mr. Bach's serious medical needs. Because Mr. Bach was a pretrial detainee, this claim is evaluated under the Fourteenth Amendment, which requires a pretrial detainee to allege facts demonstrating the following:

8

(1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined [including a decision with respect to medical treatment];

(2) Those conditions put the plaintiff at substantial risk of suffering serious harm;

(3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and

(4) By not taking such measures, the defendant caused the plaintiff's injuries.

*Sandoval v. County of San Diego*, 985 F.3d 657, 669 (9th Cir. 2021) (citing *Gordon v. County of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018)). With respect to the third element, "the plaintiff must show that the defendant's actions were 'objectively unreasonable,' which requires a showing of 'more than negligence but less than subjective intent—something akin to reckless disregard.'" *Id*. (quoting *Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016)).

In *Sandoval*, Ronnie Sandoval, a pretrial detainee died from a methamphetamine overdose while in a San Diego County jail. His widow sued the County, jail officials and medical staff under 42 U.S.C. § 1983 for violating Sandoval's Fourteenth Amendment right to adequate medical care. The evidence submitted in connection with the summary-judgment motion established that before being arrested and unbeknownst to deputies, Sandoval swallowed methamphetamine to prevent its discovery. During booking, Deputies noticed Sandoval was sweating, disoriented and lethargic so took him to a medical station for evaluation. Shortly thereafter, defendant Nurse de Guzman and another deputy entered Sandoval's cell and noticed him "shaking mildly" and displaying symptoms of withdrawals from drugs. *Id*. 888 F.3d at 662. Nurse de Guzman administered a blood sugar test that came back normal, so Sandoval was left alone and unmonitored. Approximately eight hours later, a deputy walking passed Sandoval's cell

9

noticed his eyes "'weren't tracking' and that his skin tone 'wasn't fleshy color.'" *Id.* at 663. Sandoval's eyes then rolled back into his head, and he slid to the floor. The deputy told the nurse to call paramedics, but the nurse refused and instead called EMTs, who could not provide the required level of life-saving care. Paramedics were eventually called, but when they arrived, Sandoval lost his pulse and resuscitation efforts failed.

In the lawsuit that followed, the district court granted defendants' summary-judgment motion based on qualified immunity, and the Ninth Circuit reversed. Regarding Nurse de Guzman, the court pointed out that evidence indicated the deputies told him about Sandoval's condition, yet the nurse simply conducted a 10-second check of Sandoval's blood sugar and failed to conduct a follow-up evaluation. *Id.* at 670. Also important was that de Guzman asked the deputies if Sandoval could be placed in a "sobering tank," which the court concluded indicated de Guzman suspected Sandoval was under the influence of drugs or alcohol. Based on these facts, the court explained:

> [A]lthough de Guzman knew that Sandoval remained in [a cell] only 20 feet away from a nursing station, he failed to check on Sandoval at any point during the remaining six hours of his shift. Worse still, when his shift was over, de Guzman did not relay any information about Sandoval to the nurses who replaced him. This left the night shift nurses with no way of knowing that Sandoval was being held in MOC1 for medical reasons.

*Id.* Accordingly, the Ninth Circuit found "a jury could conclude that a reasonable nurse who knew about Sandoval's condition would have understood he 'faced a 'substantial risk of suffering serious harm.'" *Id.* The court also reasoned that "de Guzman's actions toward Sandoval—which were limited to administering a quick blood test and then ignoring Sandoval for the remaining six hours of his shift—were 'akin to reckless disregard.'" *Id.* Under these facts, the Court held de Guzman was not entitled to qualified immunity. *Id.* at 680.

Turning to the issue of whether the right was clearly established, the court explained that "[o]ur cases make clear that prison officials violate the Constitution when they 'deny, delay or intentionally interfere' with needed medical treatment" or when

10

"prison officials choose a course of treatment that is 'medically unacceptable under the circumstances.'" *Id.* at 679 (citing *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) and *Snow v. McDaniel*, 681 F.3d 978, 988 (9th Cir. 2012)). Under this standard, the court previously held "correctional officers could be liable for failing to provide constitutionally adequate medical care when they knew that inmates had been exposed to pepper spray but wait[ed] four hours before allowing them to leave their cells to shower," *Clement v. Gomez*, 298 F.3d 898, 902, 904–05 (9th Cir. 2002), and that a "doctor could be held liable for a constitutional violation when he knew that an inmate's thumb was fractured but failed to ensure that the fracture was set and cast," *Jett*, 439 F.3d at 1097–98. The court concluded that the "rule reflected by these decisions is clear: a prison official who is aware that an inmate is suffering from a serious acute medical condition violates the Constitution when he stands idly by rather than responding with reasonable diligence to treat the condition." *Id.*

Under *Sandoval*, the FAC states a claim against the Medical Provider Does for failing to provide adequate medical treatment. The allegations demonstrate Medical Provider Doe 1 and 2 were aware that Mr. Bach had a serious medical condition—type-1 diabetes—that required monitoring of his blood glucose and providing him with insulin. Knowledge of his diabetes and need for insulin is demonstrated by the allegation that Medical Provider Doe 1 tested Mr. Bach's blood glucose during his initial assessment and Medical Provider Doe 2 tested his glucose on September 26 and ordered additional insulin. (*FAC* ¶¶ 33, 34.) This is also demonstrated by the allegation that Mr. Bach's hospital paperwork stated he was a type-1 diabetic and used an insulin monitor. (*Id.*) This is further confirmed by the allegation that the Medical Examiner reported "medical records" contained "documentation of [Mr. Bach's] medical condition, insulin requirements, when his pump would be depleted of insulin . . . ." (*Id.* ¶ 47.)

The FAC's allegations also demonstrate that despite being aware of Mr. Bach's serious medical condition, the Medical Provider Does did not provide him with the insulin needed to survive. From 1:51 a.m.—after receiving only 10 units of insulin—until

11

3:38 a.m., Mr. Bach was not seen by a medical provider, was not given more insulin and was found unresponsive with a glucose level greater than 500 ml. (*FAC* ¶¶ 36–40.)

Based on the above allegations, it is reasonable to infer that despite knowing about Mr. Bach's serious medical condition and need for insulin, the Medical Provider Does failed to ensure Mr. Bach received the care needed to survive. At this stage in the litigation, these allegations easily state a violation of Mr. Bach's Fourteenth Amendment rights. Additionally, for the reasons set forth in *Sandoval*, the Court finds the law was clearly established. *See also Schmidt v. County of San Diego*, 2024 WL 4308793 (S.D. Cal. 2024) (finding law clearly established that County medical staff's and deputies' failure to monitor and treat detainee who suffered from type-1 diabetes was violation of detainee's Fourteenth Amendment right). Accordingly, the Medical Provider Does are not entitled to qualified immunity for the first cause of action.

> **(b)** **Second and third causes of action – wrongful death and interference with familial relationship under the 1st and 14th Amendments**

The second cause of action is for "wrongful death – substantive due process" under section 1983. NaphCare and the County argue there is no stand-alone section 1983 wrongful-death claim. Plaintiff does not address this argument. Because Plaintiff has failed to demonstrate such a claim exists, much less that the claim is clearly established, Defendants are entitled to qualified immunity for the second cause of action.

The third cause of action is for loss of the "right of association" under section 1983. This cause is based on the theory that Defendants' deliberate indifference to Mr. Bach's serious medical needs, which led to his death, "deprived Plaintiff CECILIA BACH of her liberty interest in the family relationship in violation of her substantive due process rights afforded to her under the First and Fourteenth Amendment to the United States Constitution." (*FAC* ¶ 96.) NaphCare and the County argue these claims are not recognized under Ninth Circuit or Supreme Court authority. (*NaphCare P&A* 13:20–21;

12

*County P&A* [Doc. 11] 8:26–10:26.) In response, Plaintiff cites *Overton v. Bazzetta*, 539 U.S. 126 (2003), which evaluated whether regulations that placed restrictions on visits with prison inmates violated the substantive due process mandate of the Fourteenth Amendment, or the First or Eighth Amendments. *Id.* at 128.

Plaintiff's reliance on *Overton* is misplaced. While the Court acknowledged "the Constitution protects 'certain kinds of highly personal relationships', [citation omitted]" it refused to elaborate on those relationships in the context of prison inmates, explaining:

> The very object of imprisonment is confinement. Many of the liberties and privileges enjoyed by other citizens must be surrendered by the prisoner. An inmate does not retain rights inconsistent with proper incarceration.

*Id.* at 131 (citation omitted). Thus, while *Overton* suggests there are constitutional limits to visitation restrictions for prison inmates, the case did not establish that Defendants' refusal to allow Plaintiff to deliver insulin to Mr. Bach violated her right to companionship and society under the First or Fourteenth Amendment. Because Plaintiff has failed to identify any case establishing such a right, Defendants are also entitled to qualified immunity on the third cause of action.

### (c)    Fourth cause of action – failure to train and supervise

The fourth cause of action alleges a failure to train and supervise against all Defendants. The parties raise a number of arguments related to this claim.

First, NaphCare appears to argue qualified immunity applies because a failure to train claim is not well-established. (*NaphCare P&A* 14:16–15:2.)

Contrary to NaphCare's argument, courts permit *Monell* claims against municipalities for a failure to adequately train "[i]n limited circumstances, [where] a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Keith v. City of San Diego*, 2023 WL 2347070, at *3 (S.D. Cal. 2023) (*quoting Connick v. Thompson*, 563 U.S. 51, 61 (2011)).  In such cases, plaintiffs

13

are required to show the municipality's allegedly inadequate training amounts to "deliberate indifference," which is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id*. Because there is no vicarious or *respondeat superior* liability for municipalities under Section 1983, a *Monell* claim will only lie where policymakers were "on actual or constructive notice that a particular omission in their training program causes employees to violate citizens' constitutional rights." *Id*. Thus, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Id*.

However, in some "narrow" circumstances, "the unconstitutional consequences of failing to train could be so patently obvious that a [municipality] could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick*, 563 U.S. at 64. Such "narrow" circumstances exist when, "in light of the duties assigned to specific officers or employees, the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). Yet, courts are understandably hesitant to find such "narrow" circumstances, because such theories often "collapse[] into *respondeat superior* liability"—which plainly does not exist under section 1983. *Horton by Horton v. Cty. of Santa Maria*, 915 F.3d 592, 603 (9th Cir. 2019).  Because a failure to train claim is well-established, NaphCare's argument lacks merit.

Next, NaphCare and the County contend the FAC fails to (1) identify the alleged deficiency in training and (2) allege how the deficiency injured Mr. Bach. (*NaphCare P&A* 15:10–13; *County P&A* 11:16–17.) The FAC alleges, however, that NaphCare and the County failed to properly train the Medical Provider Does, among others, regarding "dealing with inmates in medical distress and regarding the need to communicate critical medical information to each other." (*FAC* ¶ 104.) This alleged deficiency is supported by the allegations the Medical Provider Does were aware of Mr. Bach's serious medical

14

condition but failed to provide him with insulin. And the way this alleged lack of training injured Mr. Bach is obvious: he died because of the failure to monitor his glucose and provide him with insulin. At this stage in the litigation, these allegations sufficiently identify the alleged deficiency and manner in which it injured Mr. Bach.[3]

### (d)    Fifth cause of action – *Monell* liability

The fifth cause of action alleges a cause of action under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), based on an unconstitutional policy or custom. NaphCare and the County raise several challenges to this cause of action.

First, NaphCare appears to argue this cause of action should be dismissed because it is based on an Eighth Amendment violation, not the Fourteenth Amendment. (*NaphCare P&A* 17:6–21.) This argument lacks merit. The FAC explicitly bases this claim on the violation of Mr. Bach's Fourteenth Amendment rights. (*FAC* ¶ 125.)

NaphCare next argues that if it is a state actor or acting under color of state law, it is entitled to qualified immunity. (*NaphCare P&A* 17:22.) Because the FAC sufficiently alleges the Medical Provider Does, who NaphCare purportedly employed (*FAC* ¶ 14), violated Mr. Bach's Fourteenth Amendment rights, this argument lacks merit.

Finally, the County and NaphCare argue the FAC fails to allege a custom and practice. With respect to NaphCare, it attempts to distance itself from allegations of the County's past failures to provide adequate medical care by contending that most occurred before 2022, when the County and NaphCare entered the contract to provide healthcare at the SDCJ. (*NaphCare P&A* 17:23–18.10.) The County contends that the FAC's citation to the historically high-rate of in-custody deaths is insufficient because "housing assignments, screening, and cell checks are not alleged issues herein." (*County P&A*

---

[3] Because the Fourth Cause of Action states a plausible theory of liability based on a failure to train, the Court need not consider the failure to supervise and discipline theories.

15

16:8–14.) According to the County, Plaintiff must cite a "precedent of similar . . . deaths of a diabetic patient/arrestee who allegedly did not receive his insulin." The Court is not persuaded by these arguments.

Under *Monell*, municipalities are not vicariously liable under section 1983 for the actions of their employees. *Id.* 436 U.S. at 692. Instead, "a municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue." *City of Canton*, 489 U.S. at 38 (emphasis in original). Thus, to be liable under section 1983 for a *Monell* claim, plaintiffs must show: (1) "a [municipal] employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity;" (2) "the individual who committed the constitutional tort was an official with final policy-making authority and that the challenged action itself thus constated an act of official governmental policy;" or (3) "an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Mendoza v. County of San Bernardino*, 2020 WL 2066142, at *6 (C.D.Cal. 2020) (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992)).

To state a *Monell* claim based on an unconstitutional pattern and practice, plaintiff must allege facts showing defendants acted pursuant to a custom that is so "persistent and widespread" that it establishes a "permanent and well settled city policy." *See Monell*, 436 U.S. at 690–91. A municipal policy exists when "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). In the absence of an express policy, an unconstitutional pattern or practice may be inferred from pervasive evidence of "repeated constitutional violations" that are closely related to the alleged unconstitutional pattern and practice. *Gillette*, 979 F.2d at 1349; *Oviatt v. Pearce*, 954 F.2d 1470, 1481 (9th Cir. 1992).

16

According to the FAC, between 2006 and 2020, a total of 185 people died in jails run by the San Diego County Sheriff's Department. (*FAC* ¶ 51.) In 2021, there were 18 deaths, which constituted a record high and a rate higher than any other large county across California. (*Id*.) In February 2022, the California State Auditor completed an audit of the San Diego County Sheriff's Department and found numerous deficiencies, including: (1) inconsistent follow-up care; (2) inadequate safety checks; (3) unnecessary delays in performing lifesaving measures; and (4) deficiencies in medical and mental health care system. (*Id*. ¶ 55.) In addition to these findings, in April 2022, the San Diego Citizens' Law Enforcement Review Board released results from a review of data regarding in-custody deaths in San Diego County Sheriff's jails over the past 10 years and concluded: (1) the jails have the highest number of unexplained deaths compared with all other California counties when controlling for jail population; (2) the risk of overdose/accidental deaths is the greatest in San Diego jails; and (3) the elevated risk of death appears to be isolated to the unsentenced jail population. (*Id*. ¶ 60.)

Regarding NaphCare's argument, although these allegations concern the County's failure to provide adequate medical care before NaphCare's contract, the FAC alleges that in 2023, there were 13 deaths in County jails. (*FAC* ¶ 52.) Based on this allegation, it is reasonable to infer that more than a year into NaphCare's contract, the problems with providing adequate medical care to pretrial detainees persists and thus NaphCare has continued the County's pattern and practice. Accordingly, at this stage in the litigation, the FAC adequately alleges a *Monell* claim as to NaphCare.

As for the County's argument, it fails to cite authority supporting the proposition that Plaintiff must allege a pattern involving pretrial detainees with diabetes. Nor has the Court found a case requiring such specificity, particularly not at the motion to dismiss stage where reasonable inferences are read in favor of plaintiff. Accordingly, the Court finds the FAC sufficiently alleges a pattern or practice sufficient to state a *Monell* claim.

//

//

24-cv-1687 W (DTF)

### 3. Deliberate Indifference

The County argues the FAC fails to plead deliberate indifference as to the individually named Defendants—the Sheriff, Undersheriff and Chief Medical Officer—and the Doe Defendants. The Court agrees with regard to the named Defendants, but not the Doe Defendants.

Nowhere does the FAC allege facts indicating that the Sheriff, Undersheriff or Chief Medical Officer had any contact with Mr. Bach, that they were present at SDCJ when Mr. Bach was in custody or that they were aware he was a type-1 diabetic in need of insulin. Because there are no allegations remotely indicating these named Defendants had contact with Mr. Bach, the FAC fails to allege deliberate indifference against them.

Regarding the Doe Defendants, as discussed above, the FAC's allegations sufficiently establish that the Medical Provider Does, particularly Does 1 and 2, had contact with Mr. Bach, knew about his type-1 diabetes and need for insulin, and failed to provide him with insulin, which ultimately led to his death. The FAC also alleges these Doe Defendants were either County employees or, if NaphCare employees, agents of the County. Based on these allegations, the County's argument regarding the Medical Provider Does lacks merit.

The "Factual Allegations" section also alleges that from 2 a.m. to 9 p.m. on September 27—after receiving his final dose of insulin—Mr. Bach repeatedly asked several Deputy Does and Deputy Supervisor Does for insulin, but those requests were ignored. (*FAC* ¶ 38.) The FAC also alleges that during mealtimes—during which Mr. Bach did not eat because he did not have insulin—he and other inmates notified Deputy Does and Deputy Supervisor Does that Mr. Bach needed insulin. (*Id*. ¶ 39.) Additionally, the FAC alleges other inmates attempted to get Deputy Does and Deputy Supervisor Does to provide Mr. Bach with insulin by pointing out that his *insulin pump was beeping, clearly indicating it was empty*. (*Id*.) The County acknowledges in its motion that "a person standing cell front, ignoring a person's cries for help, might qualify as deliberately indifferent. . . ." (*County P&A* 7:3–5.) At this stage in the litigation, the Deputy Does and

18

Deputy Supervisor Does *alleged* decision to ignore Mr. Bach's pleas for insulin while his empty insulin pump was beeping are tantamount to them standing cell front and ignoring his cries for help. Thus, the FAC's allegations are sufficient to plead deliberate indifference as to the Deputy Does and Deputy Supervisor Does.[4]

### B.   The state-law claims

#### 1.    *Failure to summon medical care under California Government Code § 845.6*

The sixth cause of action is for failure to summon medical care under California Government Code § 845.6. NaphCare and the County challenge this cause of action on different grounds.

NaphCare argues the claim must be dismissed because Mr. Bach "was provided medical attention when he was seen at Scripps hospital, seen by other unnamed medical personnel, and provided insulin." (*NaphCare P&A* 19:13–15.) For the reasons that follow, the Court agrees that this claim cannot be maintained against the Medical Provider Does and NaphCare.

Section 845.6 provides, in relevant part:

> Neither a public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody; but, . . . a public employee, and the public entity where the employee is acting within the scope of his employment, is liable if the employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care.

---

[4] The Court agrees with the County that the Deputy Supervisor Does are not vicariously liable for the conduct of other Deputies. (*See County P&A* at 7:27–8:13.) Instead, they are only liable if, as the FAC alleges, Deputy Supervisor Does had personal contact with Mr. Bach, were aware of his condition and ignored his pleas for insulin.

According to *Castaneda v. Dep't of Corr. and Rehab.*, 212 Cal.App.4th 1051 (2013), this section was "very narrowly written to authorize a cause of action against a public entity for its employees' failure to summon immediate medical care only, not for certain employee's malpractice in providing the care." *Id.* at 1070. In explaining the difference between failing to summon medical care and negligence in providing that care, the court stated: "*Once a practitioner has been summoned* to examine or treat a prisoner, he or she is under a duty to exercise that degree of diligence, care, and skill such as is ordinarily possessed by other members of the profession" and failure to do so is malpractice. *Id.* at 1071 (emphasis in original) (quoting *Nelson v. State of California*, 139 Cal.App.3d 72, 81 (1982)) Similarly, the "*[f]ailure of a practitioner to prescribe or provide necessary medication or treatment . . .* is a breach of such duty and as such is *also medical malpractice*," not "*a failure to summon medical care*." *Id.* (emphasis in original). Additionally, because section 845.6 "confers a broad general immunity on the public entity, the duty to "summon" medical care does not include "a duty to monitor the quality of care provided." *Id.* at 1072, citing *Watson v. State of California*, 21 Cal.App.4th 836, 841–43 (1993). Based on these principles, the court concluded:

> The failure of . . . public employees to provider further treatment, or to ensure further diagnosis or treatment, or to monitor [plaintiff] or follow up on his progress, are all facts which go to the reasonableness of the medical care provided, but do not constitute a failure to *summon* medical care.

*Id.*

Here, the FAC alleges the Medical Provider Does evaluated Mr. Bach and ordered that he receive additional insulin. (*FAC* ¶¶ 33, 34.) Under *Castaneda*, these allegations establish these Does—as well as anyone who summoned them—are not liable for failing to summon medical care under section 845.6. Additionally, the claim that the Medical Provider Does failed to monitor Mr. Bach to ensure he received his insulin, falls outside the scope of section 845.6. Because this claim cannot be maintained against the Medical Provider Does, it also fails against NaphCare.

1    In her opposition, Plaintiff points out that the FAC alleges after Mr. Bach's insulin

2    monitor was empty, he and other inmates pleaded with certain Deputy Does and Deputy

3    Supervisor Does for more insulin. As explained above, those allegations support a finding

4    that those Doe Defendants knew Mr. Bach had a serious medical condition and failed to

5    summon medical care. Thus, the FAC alleges a violation of section 845.6 as to them.

6    Finally, the County's motion also raises two challenges to this cause of action.

7    First, it contends the claim must be dismissed because the FAC fails to "identify who

8    knew that Bach needed insulin and failed to provide it." (*County P&A* 18:21–22.) For the

9    reasons stated above regarding the County's argument that the FAC fails to allege

10   deliberate indifference, the Court finds this argument lacks merit as to the Deputy Doe

11   and Deputy Supervisor Doe Defendants who ignored Mr. Bach's pleas for insulin while

12   his empty monitor was beeping.

13   Second, the County argues the claim is insufficiently stated as to the named

14   Defendants. (*County P&A* 18:19–22.) The Court agrees. Again, as stated above, the FAC

15   is devoid of any facts suggesting the named Defendants were aware that Mr. Bach had

16   diabetes or needed insulin. Thus, the FAC fails to state a claim for violation of section

17   845.6 against Defendants Kelly A. Martinez, Rich Williams or Dr. Jon Montgomery.

18

19                    ***2.    Wrongful death & survival under California Code of***

20                         ***Procedure §§ 377.30, 377.60 et seq.***

21   The seventh cause of action is for wrongful death & survival under California

22   Code of Civil Procedure §§ 377.30 and 377.60. NaphCare argues this claim should be

23   dismissed because "the FAC is devoid of any facts regarding NaphCare, or its agents,

24   being present or involved with Mr. Bach on the morning of the incident." (*NaphCare*

25   *P&A* at 20:9–11.) For the reasons discussed above regarding the Fourteenth Amendment

26   claim, this argument lacks merit.

27   NaphCare next argues "Plaintiff has failed to articulate any theory of vicarious

28   liability or plead any facts supporting a claim of wrongful death against Defendant

21

NaphCare." (*NaphCare P&A* at 20:12–15.) As discussed above, the FAC alleges the
Medical Provider Does were NaphCare employees. Thus, this argument also lacks merit.

Finally, the County contends this cause of action fails because the FAC does not
identify who knew that Mr. Bach needed insulin and failed to provide it to him. (*County
P&A* 19:8–13.) For the reasons discussed above, the Court agrees with respect to
Defendants Kelly A. Martinez, Rich Williams and Dr. Jon Montgomery, but not with
respect to the Doe Defendants, which the FAC alleges are County employees or agents.

### 3.    *Negligence*

The eighth cause of action is for negligence. NaphCare argues this claim should be
dismissed because the FAC "does not plead any facts relating to any NaphCare
employee." (*NaphCare P&A* at 21:6–8.) Because the FAC alleges the Medical Provider
Does were NaphCare employees, this argument lacks merit.

The County argues it is immune from liability under California Government Code
§ 844.6. (*County P&A* 19:21–23.) The County also argues supervisory defendants are not
liable for negligence based solely on their supervisory roles. (*Id.* 20:2–10.) Plaintiff fails
to respond to this argument. Accordingly, the Court will dismiss this cause of action as to
the County and Defendants Kelly A. Martinez, Rich Williams and Dr. Jon Montgomery.

With respect to the remaining Doe Defendants, the County contends Plaintiff does
not allege facts showing a special relationship between them and Mr. Bach. (*County P&A*
20:11–27.) Although Plaintiff did not respond to the County's argument, in opposing
NaphCare's motion, Plaintiff cites *Giraldo v. Dep't of Corr. & Rehab.*, 168 Cal.App.4th
231, 250 (2008). That case held that a special relationship exists "between jailer and
prisoner, imposing on the former a duty of care to the latter." *Id.* at 250. The Court
recognizes *Giraldo* is distinguishable factually because the case involved a claim for
failing to protect a prisoner from their cellmate. *Id.* at 240. Nevertheless, the case
contradicts the County's blanket assertion that no special relationship exists between a
jailer and prisoner. Additionally, all of the cases the County cites as support of its

22

position involve the existence of a duty between supervisory / policy-making employees, and therefore are also distinguishable. Accordingly, at this stage in the litigation, the Court finds the FAC sufficiently alleges a negligence cause of action against the Medical Provider Does, Deputy Does and Deputy Supervisor Does who had contact with Mr. Bach, knew he was a diabetic in need of insulin, and ignored his pleas for medical care.

### 4.    *Bane Act, California Government Code § 52.1*

The ninth cause of action alleges a violation of the Bane Act, California Government Code § 52.1. Defendants argue this cause of action should be dismissed because the FAC does not (1) adequately plead deliberate indifference; (2) assert allegations related to NaphCare; and (3) allege Mr. Bach's rights were violated by means of threats, intimidation, or coercion. (*NaphCare P&A* at 21:27–22:14; *County P&A* 21:9–22:27.) For the reasons discussed in above, the first two arguments lack merit.

Regarding the alleged failure to state facts demonstrating means of threats, intimidation or coercion, this argument also lacks merit. Numerous cases have applied the Bane Act to claims involving deliberate indifference, reasoning that since "deliberate indifference is closer to intentional conduct [than unintentional conduct]," liability exists where the government official "knows of and disregards a substantial risk to inmate health or safety." *M.H. v. Cnty. of Alameda*, 90 F. Supp. 3d 889, 899 (N.D. Cal. 2013) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)); *see Scalia v. Cnty. of Kern*, 308 F. Supp. 3d 1064, 1084 (E.D. Cal. 2018) ("[A] prison official's deliberate indifference to serious medical needs is a coercive act [under the Bane Act] that rises above mere negligence. . . ."); *see also Cravotta v. Cnty. of Sacramento*, 2024 WL 645705, at *13 (E.D. Cal. Feb. 15, 2024) ("[A] Bane Act claim may be based on deliberate indifference to serious medical needs."); *see also Est. of Neil v. Cnty. of Colusa*, 2022 WL 4291745, at *9 (E.D. Cal. Sept. 16, 2022) ("Courts have also found that prisoners who sufficiently allege [that] officials acted with deliberate indifference to their medical needs in violation of their constitutional rights also adequately allege a Bane Act violation.").

24-cv-1687 W (DTF)

In the context of deliberate indifference to the medical needs of prisoners, courts have held that a prisoner's Bane Act claim need simply allege "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference."  *M.H.*, 90 F. Supp. 3d at 896 (quoting *Jett*, 439 F.3d at 1096); *see Lapachet v. California Forensic Med. Grp., Inc.*, 313 F. Supp. 3d 1183, 1195 (E.D. Cal. 2018) (emphasis added) ("Plaintiffs bringing Bane Act claims for deliberate indifference to serious medical needs must only allege prison officials 'knowingly deprived [them] of a constitutional right or protection through acts that are inherently coercive and threatening,' such as housing a prisoner in an inappropriate cell, failing to provide treatment plans or adequate mental health care, and failing to provide sufficient observations."); *Cornell v. City & Cnty. of San Francisco*, 17 Cal. App. 5th 766, 802 n.31, as modified (Nov. 17, 2017) (citing with approval *M.H. v. County of Alameda*'s holding that a Bane Act claim can be based on allegations of "deliberate indifference to prisoner's medical needs.").  While "mere negligence in diagnosing or treating a medical condition" does not give rise to a Bane Act claim, "prison officials or practitioners 'deny[ing], delay[ing], or intentionally interfere[ing] with medical treatment'" does. *M.H.*, 90 F. Supp. 3d at 896 (quoting *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir.1988)). Because the FAC sufficiently pleads objective deliberate indifference, Defendants' argument lacks merit.[5]

## C.   The FAC provides sufficient notice against the Doe Defendants

NaphCare and the County challenge the FAC's Doe pleading. NaphCare contends that the FAC fails to provide sufficient notice because it (1) uses "Doe" pleading and

---

[5] The County also urges the Court to follow California cases that "have routinely held Bane Act liability requires a threatening, intimidating, or coercive act separate and distinct from the act that allegedly deprived the plaintiff of his or her federal or state rights. [Citations omitted.]" (*County P&A* 21:27–22:20.) For the reasons stated by this Court in *Dalton v. County of San Diego*, 2022 WL 1214438, *6–8 (S.D.Cal. 2022) (following reasoning in *Cornell*, 17 Cal.App.5th at 766), this Court declines to do so.

(2) "conflate[s] the acts of every named Defendant, including Doe Defendants," thus failing to differentiate each defendant's individual participation in the wrongful conduct. (*NaphCare P&A* 7:18–21, 8:5–19.) The County argues the FAC fails to "allege any specific facts regarding their conduct" and instead is based on "generalized allegations." (*County P&A* 23:2–4.) The Court disagrees with these arguments.

While the Federal Rules of Civil Procedure do not explicitly allow the naming of fictitious or anonymous parties, "where the identity of the alleged defendant is not known prior to the filing of a complaint, the plaintiff should be given an opportunity through discovery to identify the unknown defendants, unless it is clear that discovery would not uncover the identities, or that the complaint would be dismissed on other grounds." *Hernandez v. San Bernardino Cnty.*, 2023 WL 3432206, at *3 (C.D. Cal. Jan. 26, 2023) (quoting *Wakefield v. Thompson*, 177 F.3d 1160, 1163 (9th Cir. 1999)). Still, a "section 1983 action must allege how each individual defendant directly participated in the violation of the plaintiff's rights." *Id.* Thus, while a plaintiff "may refer to unknown defendants as Defendant John Doe 1, John Doe 2, John Doe 3 and so on . . . he must allege specific facts showing how each particular doe defendant violated his rights." *Keavney v. Cnty. of San Diego*, 2020 WL 4192286, at *4 (S.D. Cal. July 21, 2020). The reason behind these requirements is to give named defendants like the County "crucial notice of the nature of the claims" at issue. *Mendoza v. Cnty. of San Bernardino*, 2020 WL 2066142, at *4 (C.D. Cal. Feb. 21, 2020) (holding that the pleadings must be "sufficient to describe the involvement" of doe defendants and to put "the County on notice of the nature of the claim against it.").

As discussed above, the FAC's allegations sufficiently allege the Doe Defendants (who had direct contact with Mr. Bach and knew about his need for insulin) violated Mr. Bach's Fourteenth Amendment rights. Accordingly, Defendants' challenge to the doe pleading lacks merit.

IV.    **CONCLUSION & ORDER**

For the reasons stated above, the Court **GRANTS IN PART** and **DENIES IN PART** NaphCare's motion to dismiss [Doc. 10] and the County Defendant's motion to dismiss [Doc. 11] as follow:

- The second and third causes of action are **DISMISSED WITHOUT LEAVE TO AMEND**.

- The sixth cause of action is **DISMISSED WITHOUT LEAVE TO AMEND** as to NaphCare and the Medical Provider Does.

- The first, sixth, seventh, eighth and ninth cause of action are **DISMISSED** as to Defendants Kelly A. Martinez, Rich Williams and Dr. Jon Montgomery, D.O. Because at this stage the Court cannot conclude leave to amend would be futile, Plaintiff has **LEAVE TO AMEND** as to these Defendants until **July 14, 2025**.

**IT IS SO ORDERED.**

Dated:  June 23, 2025

Hon. Thomas J. Whelan
United States District Judge

26

24-cv-1687 W (DTF)