Eugene P. Ramirez (State Bar No. 134865)
  *eugene.ramirez@manningkass.com*
Marguerite L. Jonak (State Bar No. 143979)
  *marguerite.jonak@manningkass.com*
David Fleck (State Bar No. 192912)
  *David.Fleck@manningkass.com*
**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**
225 Broadway, Suite 2000
San Diego, California 92101
Telephone: (619) 515-0269
Facsimile: (619) 515-0268

Attorneys for Defendant
NAPHCARE, INC.

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CECILIA BACH, individually and as Successor in Interest to the ESTATE OF KEITH BACH, | Case No. 3:24-cv-01687-W-DTF<br>Assigned to: Hon. Thomas J. Whelan<br>Magistrate Judge D. Thomas Ferraro |
| Plaintiffs, | |
| v. | **THIRD PARTY COMPLAINT** |
| COUNTY OF SAN DIEGO, CITY OF CHULA VISTA, KELLY A. MARTINEZ, in her individual capacity, RICH WILLIAMS, in his individual capacity; NAPHCARE, INC.; DR. JON MONTGOMERY, D.O; and DOES 1 to 100, inclusive, | Filed Date:      09/20/24<br>Trial Date:      N/A |
| Defendants. | |
| NAPHCARE, INC., | |
| Third-Party Plaintiff, | |
| v. | |
| SCRIPPS HEALTH, a California nonprofit corporation; and CORRECTIONAL HEALTHCARE PARTNERS, INC., a California corporation, | |
| Third-Party Defendants. | |

MANNING | KASS

**INTRODUCTION**

1)    Defendant and Third-Party Plaintiff NaphCare, Inc. ("NaphCare"), by and through its undersigned counsel, brings this Third-Party Complaint against Third-Party Defendants Scripps Health, a California nonprofit public benefit corporation ("Scripps"), and Correctional Healthcare Partners, Inc., a California corporation ("CHP") (collectively, "Third-Party Defendants).

2)    This is a third-party action brought pursuant to Rule 14 of the Federal Rules of Civil Procedure for equitable indemnity, contribution, professional negligence, contractual indemnification, and declaratory relief.

3)    In the underlying action, Plaintiff alleges federal civil rights violations under 42 U.S.C. § 1983 and related state-law claims, arising from alleged deliberate indifference and/or negligence in the treatment of Keith Galen Bach ("Bach") while incarcerated in the San Diego Central Jail ("SDCJ").

4)    NaphCare provides certain contract healthcare services at the SDCJ and was named as a defendant in the underlying action. NaphCare denies liability to Plaintiff but alleges that if Plaintiff sustained any injury or damage as claimed, such injury or damage was caused, in whole or in part, by the acts and omissions of Third-Party Defendants.

5)    This action seeks equitable indemnity, contribution, professional negligence damages, and declaratory relief arising from Scripps' medical evaluation and clearance of Bach in the underlying action for incarceration despite knowledge that Bach's insulin pump was empty or near empty, that no alternative insulin therapy had been initiated, and that these omissions created a foreseeable risk of injury.

6)    This action seeks equitable indemnity, contribution, professional negligence damages, contractual indemnification, and declaratory relief arising from CHP's agreement to provide on-site medical providers and the failure to provide safe and adequate medical care to a known Type 1 diabetic in custody by

Case No. 3:24-cv-01687-W-DTF

discontinuing his established insulin pump regimen, substituting it with an inappropriate and insufficient treatment plan, and failing to properly monitor Bach after the treatment plan was implemented.

## JURISDICTION AND VENUE

7)    This Court has original jurisdiction over the underlying action pursuant to 28 U.S.C. § 1331 because Plaintiff asserts claims arising under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

8)    This Court has supplemental jurisdiction over the claims asserted in this third-party complaint pursuant to 28 U.S.C. § 1367(a). The claims herein arise from the same transaction, occurrence, or series of transactions and occurrences as the claims in the underlying action, namely, the healthcare services provided to Bach from the time he was taken into custody on September 25, 2023 until he died in custody on September 29, 2023. Their resolution will involve many of the same facts, evidence, and witnesses.

9)    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to these claims occurred within this judicial district, and at least one Third-Party Defendant resides, is found, or conducts business in this district.

## PARTIES

10)    NaphCare is, and at all relevant times was, contracted by Defendant County of San Diego ("County") to provide healthcare services to inmates at SDCJ in San Diego County, California.

11)    NaphCare is named as a defendant in the underlying action pending in this Court, *Cecilia Bach et al vs. County of San Diego et al*, Case No. 3:24-CV001687-W-BJC.

12)    As a benefit to NaphCare, the affiliated entity NaphCare of San Diego, LLC entered into a contract with CHP to provide on-site services, sick call, and on call services (after-hours calls) to detainees at the San Diego County Jails, including

MANNING | KASS

SDCJ.

13)    NaphCare is informed and believes, and thereon alleges, that Scripps is now, and at all relevant times was, a corporation organized and existing under the laws of the State of California, operating an emergency department and providing medical services in San Diego, California.

14)    NaphCare is informed and believes, and thereon alleges, that CHP is now, and at all times relevant to this action, was a corporation organized and existing under the laws of the State of California, and was contracted on NaphCare's behalf to provide medical services to inmates at SDCJ in San Diego, California.

15)    NaphCare is informed and believes, and thereon alleges, that at all relevant times each of the Third-Party Defendants was the agent, servant, employee, partner, joint venturer, co-conspirator, or alter ego of each of the Defendants and other Third-Party Defendants, and in doing the acts alleged herein was acting within the course and scope of such relationship, and with the permission and consent of the Defendants and other Third-Party Defendants.

## FACTUAL ALLEGATIONS

16)    On September 25, 2023, Keith Galen Bach ("Bach") was taken into custody by the San Diego Sheriff's Department.

17)    Bach, a 63-year-old male with insulin-dependent diabetes, hypertension, and hyperlipidemia, was brought to the Scripps Mercy Hospital Chula Vista Emergency Department ("Chula Vista ED") in police custody for medical clearance.

18)    Dr. Tonianne French ("Dr. French") served as Bach's attending physician at Chula Vista ED.

19)    During her evaluation, Dr. French noted that Bach used an insulin pump which was audibly beeping, a signal that it was empty or nearly empty. Bach informed her that he lacked the supplies necessary to refill the device. A point-of-

care glucose test ("POCT") showed a level of 265 mg/dL, confirming that his blood sugar was elevated.

20)    Despite this, Dr. French medically cleared Bach for incarceration. She documented that Bach would need to refill the insulin pump at jail once he received the appropriate supplies from home, but also acknowledged that he would face barriers to obtaining those supplies while in custody.

21)    Even though he was in police custody, Dr. French discharged Bach with generic instructions to follow up at a primary care clinic and to return to the emergency department if symptoms worsened. He was released to deputies for booking.

22)    On information and belief, Dr. French knew that the insulin pump was nonfunctional due to lack of insulin, or soon would be, yet discharged Bach without initiating any alternative insulin therapy or bridging regimen prior to transfer.

23)    On information and belief, Dr. French understood and documented that custody would prevent timely access to insulin supplies, yet cleared Bach for booking without taking any steps to ensure continuity of insulin delivery.

24)    On information and belief, Dr. French discharged Bach with an elevated glucose level of 265 mg/dL and with an uncertain insulin delivery system, when the safer course would have been to defer clearance until insulin therapy could be resumed or a bridging regimen implemented.

25)    On information and belief, Dr. French failed to verify whether the jail could provide immediate insulin or pump supplies upon arrival, and failed to communicate with jail medical staff to ensure a plan for uninterrupted insulin therapy.

26)    On information and belief, Dr. French failed to provide deputies or jail staff with clear instructions regarding the pump and the need for immediate insulin replacement, or the necessity of monitoring for hyperglycemia and diabetic ketoacidosis.

27)    On information and belief, Dr. French instead issued only generic discharge instructions, which were impractical in the custodial setting and did not address the known, time-sensitive risk posed by the absence of basal insulin.

28)    On information and belief, Dr. French failed to document any concrete disposition plan to prevent foreseeable deterioration from insulin deprivation, despite her acknowledgment of custody-related barriers to obtaining the necessary supplies.

29)    Later that same evening, Bach was brought to Scripps Mercy Hospital, San Diego ("San Diego ED") in police or deputy custody after experiencing a syncopal episode (loss of consciousness) during the jail booking process.

30)    Dr. Chad Michael Bernhardt ("Dr. Bernhardt") was the attending physician and conducted Bach's evaluation. He ordered diagnostic tests, including a comprehensive metabolic panel, complete blood count, electrocardiogram, and chest X-ray, which showed no acute cardiac abnormality, no severe electrolyte disturbance, and no evidence of hypoglycemia. Bach's blood glucose at that time was recorded at 141 mg/dL.

31)    Bach was placed on continuous cardiac monitoring, which showed a regular rhythm. After a period of observation, Dr. Bernhardt discharged him back to police custody and medically cleared him again for incarceration.

32)    On information and belief, Dr. Bernhardt failed to evaluate or address the prior finding that Bach's insulin pump was nonfunctional, empty, or close to empty, and did not confirm whether Bach had received any insulin in the interval since his earlier discharge.

33)    On information and belief, Dr. Bernhardt failed to assess whether Bach's syncopal episode could have been related to uncontrolled or fluctuating blood glucose in the context of a nonfunctioning insulin pump, instead focusing on situational or cardiac explanations without adequately ruling out a metabolic or diabetic cause.

Case No. 3:24-cv-01687-W-DTF

34)     On information and belief, Dr. Bernhardt discharged Bach for booking without providing deputies or jail medical staff with clear instructions that his insulin pump was not delivering insulin, or soon would not be, and that substitute insulin therapy would be required.

35)     On information and belief, Dr. Bernhardt failed to warn jail personnel that Bach required prompt access to his insulin pump supplies or prescribed insulin injections to prevent hyperglycemia and diabetic ketoacidosis.

36)     On information and belief, Dr. Bernhardt prematurely cleared Bach for incarceration despite knowledge, or access to knowledge, that his diabetes management was disrupted and could not be adequately maintained without immediate medical intervention.

37)     Scripps and its employees should not have cleared Bach for booking and incarceration without a clear plan to ensure continuity of diabetes care. Both Dr. French and Dr. Bernhardt should have provided deputies with explicit instructions to secure uninterrupted insulin therapy for Bach in custody, but neither did so.

38)     Upon intake at the correctional facility, medical personnel confirmed that Bach had both a continuous glucose monitor ("CGM") and an insulin pump. Nurses also verified that he was prescribed metformin and self-administered insulin through his pump up to eight times daily.

39)     Nurse Practitioner Katherine O'Neal ("NP O'Neal"), a NaphCare employee working remotely through NaphCare's "StatCare" program, received the following message at 3:38 AM on September 26, 2023, from an onsite County nurse:

**Message:**

IDDM BS 123, asymptomatic. Pt came in with CGM and insulin pump. Earlier pt had LOC at intake, medically cleared at the hospital. Pt denies seizure disorder. Please review SS. Thank you.

**Translated for nonmedical persons:**

This meant that Bach had insulin-dependent diabetes; his blood sugar was 123 (within safe range) and he had no symptoms. He had arrived with his CGM and insulin pump. Earlier, he fainted during intake and was medically cleared at the hospital. He denied any seizure disorder. The nurse requested that his SureScripts prescription history be reviewed.

40)    At 3:49 AM, NP O'Neal placed orders for medications, vital sign checks, and blood sugar checks in the chart, and she noted in the chart and via a response to the County's nurse:

**Message:**

Chart reviewed SS reviewed please confirm dosing for metformin, Are they taking 250mg daily continue insulin pump for now will add blood sugar checks meds restarted from SS.

**Translated:**

NP O'Neal reviewed Bach's chart and SureScripts history, asked for confirmation of his metformin dose, directed that the insulin pump be continued for now, added blood sugar checks, and ordered restart of medications from SureScripts.

41)    At 4:08 AM, an onsite County nurse (not employed by NaphCare) replied:

**Message:**

confirmed by pt. taking metformin 250mg daily '8x a day via insulin pump'. Pt. reports his current meds via Insulin pump be consumed tomorrow morning around 0800.

**Translated:**

Bach confirmed that he was taking metformin 250 mg daily and reported that he used his insulin pump 8 times daily. He stated the insulin in his pump would run out the next morning (September 27) around 8:00 AM.

MANNING | KASS

42)    At 4:11 AM, NP O'Neal replied:

**Message:**

thank you for update. will keep emar the same.

**Translated:**

Thank you for the update. We will keep the electronic medication administration record (eMAR) unchanged.

43)    A County nurse scheduled Bach to be assessed by an on-site medical provider later that day.

44)    Later that morning at 11:58 AM and prior to his assessment by an on-site provider, another NaphCare StatCare employee received the following alert from onsite County staff:

**Message:**

Pt stated he takes novolin R 1 unit per 5 grams of carbohydrate. Pt stated he needs 12 units of insulin for his 60 grams of carbohydrates and stated he needs about 15 units of NPH for dinner. please advice [*sic*].

**Translated:**

Bach explained his usual insulin regimen: 1 unit of Novolin R per 5 grams of carbohydrate, meaning 12 units for his current 60-gram meal, plus about 15 units of NPH at dinner. The onsite nurse requested guidance on dosing.

45)    At 12:07 PM, The StatCare provider responded:

**Message:**

Please defer to site provider. Current BG wnl. SS reviewed-unable to verify long-acting insulin. Need to verify insulin order prior to ordering. Thanks.

**Translated:**

The StatCare provider deferred to the onsite healthcare provider. Bach's blood sugar was within normal limits. The SureScripts record did not clarify his long-acting insulin prescription. Verification was needed before any order could be made.

46)    On September 26, 2023, NP Nicholas Kahl ("NP Kahl"), an onsite employee of CHP, assessed Mr. Bach in his holding cell, noted that Bach had an insulin pump, and significantly altered Bach's treatment. NP Kahl prescribed 10 units of Novolin R three times daily with meals for 30 days, replacing Bach's individualized insulin pump therapy. On information and belief, this abrupt change disregarded Bach's variable pump regimen, increased the risk of poor glycemic control, and predisposed him to diabetic ketoacidosis. NP Kahl also ordered four-times-daily blood sugar checks for one month.

47)    At 12:42 PM, NP Kahl documented these orders in a SOAP note, acknowledging Bach's diagnosis of Type 1 diabetes, his continued use of an insulin pump and CGM, and Bach's request for a 12-unit dose before lunch, but disregarded that request. NP Kahl stated he would review Bach's chart further the following day (September 27) to assess glucose trends but, on information and belief, failed to do so despite making that appointment himself and later-documented hyperglycemia.

48)    Later on September 26, 2023, a County nurse noted that Bach's blood sugar was checked and determined to be 128 so insulin was withheld.  However, the patient received his 10 units of Novolin via injection at about 4:46 p.m. on September 26, 2023.

49)    On September 27, 2023, blood sugar checks revealed severe hyperglycemia, including a reading of 322 mg/dL. Bach refused the scheduled 10-unit dose and requested 20 units consistent with his prior regimen. Nursing staff documented this and sought medical review.

50)    At 1:15 AM on September 27, 2023, NP O'Neal received the following alert:

**Message:**

Current BS is 322 mg/dl. Pt refused the scheduled does [*sic*] of 10 and requesting 20 unites (*sic)* instead. Pls advise.

**Translated:**

Bach's blood sugar was 322 mg/dL. He refused the scheduled 10 units of insulin and asked for 20 units. The nurse asked for guidance.

51)    At 1:37 AM, NP O'Neal replied:

**Message:**

Chart reviewed Noted patient continues to have insulin pump and checks blood sugar 8 times a day Site provider evaluated patient and placed patient on 10units regular insulin TID with meals pt refusing insulin this morning and requesting to receive 20 units pt did request 12 units yesterday. please have patient take the 10 units this morning, and follow with site provider to determine if increase in dosage it necessary given insulin pump recheck blood sugar in 2 hours after meals please confirm if patient is able to given self insulin through insulin pump."

**Translated:**

NP O'Neal directed that Bach should be given the scheduled 10 units, instructed follow-up with the onsite provider about any increase, and requested a two-hour post-meal recheck. She also asked onsite staff to confirm whether Bach could administer insulin himself through his pump.

52)    Neither County staff nor any other onsite provider provided any additional information about Bach to any NaphCare employee.  NaphCare employees had no further involvement in Bach's care after this message at 1:37 AM on September 27, 2023.

53)    A County nurse administered 10 units of Novolin via injection at about 1:53 a.m. on September 27, 2023.  Bach refused his evening doses of medications on September 27, 2023.

54)    Bach was found unresponsive in his cell at 3:40 AM on September 28, 2023, and CPR and other life-saving attempts were not successful.

Case No. 3:24-cv-01687-W-DTF

**FIRST CAUSE OF ACTION**

*(Equitable Indemnity – Against All Third-Party Defendants)*

55)   NaphCare realleges and incorporates by reference the allegations set forth above as though fully set forth herein.

56)   On or about September 25, 2023 through September 29, 2023, Third-Party Defendants each owed duties of care to Bach in connection with the evaluation, diagnosis, and treatment of his insulin-dependent diabetes.

57)   While NaphCare denies liability for Bach's alleged injuries, if Plaintiff establishes such injuries and any liability is imposed on NaphCare, then Scripps's and its employees' acts or omissions constituted breaches of duty and were substantial factors in causing or contributing to those injuries, including but not limited to:

    a)   Failing to ensure continuity of care between Chula Vista ED and San Diego ED, despite both operating under the same hospital system and having integrated access to prior records;

    b)   Clearing Bach for incarceration at Chula Vista ED despite knowledge that his insulin pump was beeping, likely empty or almost empty, and that he lacked the necessary supplies to maintain essential insulin therapy while in custody;

    c)   Acknowledging but disregarding barriers to Bach obtaining his insulin supplies while incarcerated, and nonetheless authorizing his release to law enforcement without safeguards;

    d)   Failing to communicate critical information about Bach's insulin pump and immediate insulin needs to jail deputies or jail medical staff at the time of clearance;

    e)   Clearing Bach for incarceration a second time at San Diego ED following his syncopal episode, without reassessing the risk of diabetic complications in light of his pump's documented beeping and failure

MANNING | KASS

earlier that same evening;

f)      Failing to investigate metabolic or diabetic causes for Bach's syncopal episode, despite having access to prior records reflecting disruption of insulin delivery;

g)      Omitting any mention of the nonfunctional insulin pump in San Diego ED records, thereby depriving subsequent custodial medical providers of critical information necessary for continuity of care;

h)      Discharging Bach without adequate instructions to law enforcement or jail medical personnel regarding his need for immediate insulin replacement or close glucose monitoring in custody; and

i)      Prematurely clearing Bach for incarceration on two separate occasions, despite known or knowable risks of diabetic. decompensation, including hyperglycemia and diabetic ketoacidosis.

58)    While NaphCare denies liability for Plaintiff's alleged injuries, on information and belief, if Plaintiff establishes such injuries and any liability is imposed on NaphCare, then the acts or omissions of Scripps and its employees were a substantial factor in causing or contributing to those alleged injuries.

59)    While NaphCare denies liability for Bach's alleged injuries, if Plaintiff establishes such injuries and any liability is imposed on NaphCare, then CHP's and its employees' acts or omissions constituted breaches of duty as the on-site provider(s) of medical care, and were a substantial factor in causing or contributing to those injuries, including but not limited to:

a)      Abruptly discontinuing Bach's insulin pump therapy without ensuring a safe and equivalent replacement regimen;

b)      Prescribing a rigid fixed-dose of 10 units of short-acting insulin three times daily with meals, despite Bach's reported individualized regimen based on carbohydrate intake and higher daily requirements;

c)      Failing to prescribe or verify long-acting insulin, an essential

13

component of Type 1 diabetes management, even after being alerted to the absence of such verification;

d)    Disregarding Bach's repeated reports and requests for insulin doses consistent with his established regimen, thereby ignoring individualized medical needs;

e)    Documenting an intent to review Bach's blood glucose trends the following day but, on information and belief, failing to carry out that reassessment;

f)    Omitting to escalate care by admitting Bach to a medical unit or ordering closer monitoring, despite his known history of loss of consciousness and uncontrolled blood sugars; and

g)    Neglecting to provide deputies or jail staff with clear instructions about the warning signs of hyperglycemia or diabetic emergencies, leaving non-medical personnel unprepared to safeguard Bach's health.

60)   While NaphCare denies liability for Plaintiff's alleged injuries, on information and belief, if Plaintiff establishes such injuries and any liability is imposed on NaphCare, then the acts or omissions of CHP and its employees were a substantial factor in causing or contributing to those alleged injuries.

61)   If Plaintiff sustained any injury or damage as alleged in the underlying complaint, such injury or damage was proximately caused and/or contributed to by the acts and omissions of Third-Party Defendants and each of them.

62)   Under the principles of comparative fault and equitable indemnity recognized in California, NaphCare is entitled to indemnity from Third-Party Defendants and each of them for any sums awarded against NaphCare in proportion to the comparative fault of Third-Party Defendants and each of them.

63)   NaphCare seeks a determination of the comparative fault of all parties whose acts or omissions contributed to Bach's alleged injuries and an order requiring Third-Party Defendants and each of them to indemnify NaphCare in an amount

Case No. 3:24-cv-01687-W-DTF

1    commensurate with their proportionate share of fault.

2              **SECOND CAUSE OF ACTION**

3         *(Contribution – Against All Third-Party Defendants)*

4    64)    NaphCare realleges and incorporates by reference the allegations set forth

5          above as though fully set forth herein.

6    65)    On or about the dates alleged in the underlying complaint, NaphCare and

7          Third-Party Defendants, and each of them, were jointly and severally liable to

8          Plaintiff for the same injury or damage as alleged in the underlying complaint.

9    66)    On information and belief, if any judgment is entered against NaphCare in

10         favor of Plaintiff in the underlying action, it will be the result, in whole or in

11         part, of the acts and omissions of Scripps, including but not limited to:

12              a)    Failing to ensure continuity of care between Chula Vista ED and

13              San Diego ED, despite both operating under the same hospital system

14              and having integrated access to prior records;

15              b)    Clearing Bach for incarceration at Chula Vista ED despite

16              knowledge that his insulin pump was beeping, likely empty or almost

17              empty, and that he lacked the necessary supplies to maintain essential

18              insulin therapy while in custody;

19              c)    Acknowledging but disregarding barriers to Bach obtaining his

20              insulin supplies while incarcerated, and nonetheless authorizing his

21              release to law enforcement without safeguards;

22              d)    Failing to communicate critical information about Bach's

23              nonfunctioning insulin pump and immediate insulin needs to jail

24              deputies or jail medical staff at the time of clearance;

25              e)    Clearing Bach again for incarceration at San Diego ED following

26              his syncopal episode, without reassessing the risk of diabetic

27              complications in light of his pump's documented beeping and failure

28              earlier that same evening;

f)  Failing to investigate metabolic or diabetic causes for Bach's syncopal episode, despite having access to prior records reflecting disruption of insulin delivery;

g)  Omitting any mention of the nonfunctional insulin pump in San Diego ED records, thereby depriving subsequent custodial medical providers of critical information necessary for continuity of care;

h)  Discharging Bach without adequate instructions to law enforcement or jail medical personnel regarding his need for immediate insulin replacement or close glucose monitoring in custody; and

i)  Prematurely clearing Bach for incarceration on two separate occasions, despite known or knowable risks of diabetic decompensation, including hyperglycemia and diabetic ketoacidosis.

67)  While NaphCare denies liability for Plaintiff's alleged injuries, on information and belief, if Plaintiff establishes such injuries and any liability is imposed on NaphCare, then the acts or omissions of Scripps and its employees were a substantial factor in causing or contributing to those alleged injuries.

68)  On information and belief, if any judgment is entered against NaphCare in favor of Plaintiff in the underlying action, it will be the result, in whole or in part, of the acts and omissions of CHP, as the on-site provider(s) of medical care, including but not limited to:

a)  Abruptly discontinuing Bach's insulin pump therapy without ensuring a safe and equivalent replacement regimen;

b)  Prescribing a rigid fixed-dose of 10 units of short-acting insulin three times daily with meals, despite Bach's reported individualized regimen based on carbohydrate intake and higher daily requirements;

c)  Failing to prescribe or verify long-acting insulin, an essential component of Type 1 diabetes management, even after being alerted to the absence of such verification;

d)      Disregarding Bach's repeated reports and requests for insulin doses consistent with his established regimen, thereby ignoring individualized medical needs;

e)      Documenting an intent to review Bach's blood glucose trends the following day but, on information and belief, failing to carry out that reassessment;

f)      Omitting to escalate care by admitting Bach to a medical unit or ordering closer monitoring, despite his known history of loss of consciousness and uncontrolled blood sugars; and

g)      Neglecting to provide deputies or jail staff with clear instructions about the warning signs of hyperglycemia or diabetic emergencies, leaving non-medical personnel unprepared to safeguard Bach's health.

69)   While NaphCare denies liability for Plaintiff's alleged injuries, on information and belief, if Plaintiff establishes such injuries and any liability is imposed on NaphCare, then the acts or omissions of Scripps and its employees were a substantial factor in causing or contributing to those alleged injuries.

70)   Under California Code of Civil Procedure §§ 875–876, if NaphCare is compelled to pay more than its *pro rata* share of any judgment entered in favor of Plaintiff, NaphCare will be entitled to recover contribution from Third-Party Defendants, and each of them, for the amount paid in excess of its pro rata share.

71)   NaphCare seeks judgment for contribution against Third-Party Defendants, and each of them, in an amount equal to the difference between the amount NaphCare is required to pay to Plaintiff, by way of judgment or settlement, and NaphCare's proportionate share of liability for Plaintiff's alleged injury and damages, together with costs of suit and such other and further relief as the Court may deem proper.

**THIRD CAUSE OF ACTION**

*(Professional Negligence – Against All Third-Party Defendants)*

72)    NaphCare realleges and incorporates by reference the foregoing allegations as though fully set forth herein.

73)    At all relevant times, Third-Party Defendants, and each of them, were licensed healthcare providers engaged in the evaluation, diagnosis, and treatment of patients, including Bach in the underlying action, acting within the course and scope of their professional licensure and employment.

74)    On or about the date alleged in the underlying complaint, Bach was transported to an emergency department operated or staffed by Third-Party Defendants for medical clearance prior to incarceration at SDCJ.

75)    On information and belief, Bach presented with an insulin pump that was audibly alarming due to an empty or almost empty reservoir and reported that he lacked the proprietary supplies required to refill the pump.

76)    On information and belief, Scripps personnel knew or should have known that Bach's blood glucose measured 265 mg/dL, that his insulin pump was not delivering basal insulin, and that without prompt restoration of insulin therapy he faced a foreseeable risk of hyperglycemia and progression to diabetic ketoacidosis.

77)    Despite this knowledge, Scripps, on information and belief, acted negligently by:

a.    Failing to ensure continuity of care between Chula Vista ED and San Diego ED, although both facilities operated within the same hospital system and had integrated access to prior records;

b.    Clearing Bach for incarceration at Chula Vista ED despite a beeping, likely empty insulin pump and the absence of required pump supplies;

MK MANNING | KASS

c.   Acknowledging but disregarding barriers to Bach obtaining his insulin supplies while in custody, and nevertheless authorizing release without safeguards;

d.   Failing to communicate to jail deputies or medical staff that Bach's insulin pump was nonfunctional and that immediate substitute insulin therapy was required;

e.   Clearing Bach again at San Diego ED following a syncopal episode, without reevaluating the risk of diabetic complications in light of the earlier pump failure;

f.   Failing to investigate metabolic or diabetic causes for the syncopal episode despite access to prior records showing disruption of insulin delivery;

g.   Omitting any reference to the nonfunctional pump in San Diego ED records, thereby depriving subsequent custodial providers of critical continuity-of-care information;

h.   Discharging Bach without adequate instructions to law enforcement or jail medical personnel regarding urgent insulin replacement or close glucose monitoring; and

i.   Prematurely clearing Bach for incarceration on two separate occasions despite known or knowable risks of hyperglycemia and diabetic ketoacidosis.

78)   On information and belief, Scripps's failure to address, document, and communicate the interruption in insulin therapy permitted that interruption to persist undetected and untreated during subsequent encounters, which was a substantial factor in causing Plaintiff's alleged injuries.

79)   On information and belief, CHP and its employees knew or should have known that Bach's insulin pump had been discontinued and that, without a safe

1    and equivalent replacement regimen, he faced a foreseeable risk of

2    hyperglycemia and diabetic ketoacidosis.

3    80)   Despite this knowledge, CHP, on information and belief, acted negligently

4          by:

5                a)    Abruptly discontinuing Bach's insulin pump therapy without

6                      ensuring a safe and equivalent replacement regimen;

7                b)    Prescribing a rigid fixed-dose of 10 units of short-acting insulin

8                      three times daily with meals, contrary to Bach's individualized regimen

9                      based on carbohydrate intake and higher daily requirements;

10               c)    Failing to prescribe or verify long-acting insulin, a necessary

11                     component of Type 1 diabetes management, even after being alerted to

12                     the absence of such verification;

13               d)    Ignoring Bach's repeated reports and requests for insulin doses

14                     consistent with his established regimen;

15               e)    Documenting an intent to review Bach's glucose trends the

16                     following day but, on information and belief, failing to conduct that

17                     reassessment;

18               f)    Failing to escalate care by admitting Bach to a medical unit or

19                     ordering closer monitoring despite his history of loss of consciousness

20                     and uncontrolled blood sugars; and

21               g)    Neglecting to provide deputies or jail staff with instructions

22                     regarding warning signs of hyperglycemia or diabetic emergencies,

23                     leaving non-medical personnel unprepared to safeguard Bach's health.

24   81)   On information and belief, CHP's failure to address, document, and

25         communicate the interruption of insulin therapy likewise permitted that

26         interruption to persist undetected and untreated during subsequent encounters,

27         which was a substantial factor in causing Plaintiff's alleged injuries.

28

MANNING | KASS

82)  The foregoing acts and omissions by Scripps and CHP fell below the standard of care applicable to healthcare providers under similar circumstances and constituted professional negligence.

83)  As a direct and proximate result of this negligence, including the failure to ensure continuity of insulin therapy and to document and communicate that need to subsequent providers, Plaintiff in the underlying action allegedly sustained injury and damages.

84)  To the extent NaphCare is held liable for any portion of such damages, such liability will have been caused, in whole or in part, by the negligent acts and omissions of Third-Party Defendants, thereby entitling NaphCare to indemnity, contribution, and/or apportionment of fault as permitted by law.

### FOURTH CAUSE OF ACTION
#### *(Contractual Indemnification Against CHP)*

85)  NaphCare realleges and incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

86)  At all relevant times, NaphCare of San Diego, LLC and CHP were parties to a written agreement for the benefit of NaphCare under which CHP undertook to provide healthcare services to inmates housed at the jail facility where Bach was detained.

87)  That agreement contains an express mutual indemnification clause. Section 4.2 of the agreement provides in full:

4.2 Indemnification. The Parties agree to mutually indemnify and hold each other harmless, including their agents, officers, employees, and subcontractors, from and against all loss or expense, including but not limited to reasonable attorney's fees, for bodily injury, including death, and property loss or damage arising out of any wrongful, intentional malicious, willful, wanton or deliberately indifferent act, negligence, or omission of the other party, its agents, officers, employees or subcontractors. The Parties will have

no obligation to indemnify, defend and hold harmless the other party, its agents, officers, employees, and subcontractors for any injury or damage caused by or resulting from the wrongful, intentional, malicious, willful, wanton or deliberately indifferent act solely caused by the negligence, or omission of the other party, its agents, officers, employees or subcontractors. Each Party shall retain control over the defense of, and any resolution or settlement relating to such loss, and each shall cooperate with the other and provide reasonable assistance in defending any such claim.

88)   On information and belief, personnel employed by or acting on behalf of CHP – including those responsible for evaluating, prescribing for, and monitoring Bach – interacted directly with Bach during the period alleged in the underlying complaint and delivered or failed to deliver care as described above.

89)   The acts and omissions of CHP and its personnel, including but not limited to the negligent delivery of healthcare services to Bach, form part of the basis of Plaintiff's claims against NaphCare in the underlying action.

90)   Accordingly, pursuant to Section 4.2 of the agreement, NaphCare is entitled to indemnification from CHP for any and all liability, damages, costs, and expenses, including attorney's fees, incurred in defending or satisfying any judgment or settlement in the underlying action, to the extent such liability arises from the negligent acts or omissions of CHP or its personnel.

### FIFTH CAUSE OF ACTION

#### *(Declaratory Relief – Against All Third-Party Defendants)*

91)   NaphCare realleges and incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

92)   An actual and justiciable controversy exists between NaphCare and the Third-Party Defendants regarding their respective rights, duties, and liabilities for any damages alleged by Plaintiff in the underlying action.

Case No. 3:24-cv-01687-W-DTF

93)   NaphCare contends that, if Plaintiff sustained any injury or damage as alleged, such injury or damage was proximately caused, in whole or in part, by the acts and omissions of the Third-Party Defendants, and each of them.

94)   On information and belief, the acts and omissions of the Third-Party Defendants were substantial factors in causing the injuries alleged by Plaintiff.

95)   On information and belief, the Third-Party Defendants dispute these contentions and deny responsibility for Plaintiff's alleged injuries and damages.

96)   A judicial declaration is therefore necessary and appropriate under 28 U.S.C. § 2201 and applicable state law to determine the respective rights and obligations of NaphCare and the Third-Party Defendants, including but not limited to:

a)   Whether the Third-Party Defendants owed a duty of care to Plaintiff in the underlying action;

b)   Whether the Third-Party Defendants breached that duty;

c)   The extent to which the acts or omissions of the Third-Party Defendants were a proximate cause of Plaintiff's alleged injuries and damages; and

d)   The proportion of liability, if any, to be allocated to the Third-Party Defendants.

97)   Such a declaration will resolve the present controversy concerning the allocation of fault and liability, clarify the parties' respective legal rights and duties, and prevent a multiplicity of actions by adjudicating in this proceeding the proper apportionment of responsibility for Plaintiff's alleged injuries and damages.

### PRAYER FOR RELIEF

WHEREFORE, Third-Party Plaintiff NaphCare, Inc. prays for judgment against Third-Party Defendants, and each of them, as follows:

1.      For equitable indemnity in favor of NaphCare, in whole or in part, for any sums awarded to Plaintiff in the underlying action, in proportion to the comparative fault of Third-Party Defendants, and each of them;

2.      For contribution from Third-Party Defendants, and each of them, to the extent NaphCare is compelled to pay more than its proportionate share of any judgment or settlement entered in the underlying action;

3.      For damages according to proof for the professional negligence of Third-Party Defendants, and each of them, including but not limited to indemnity and/or contribution for any judgment, settlement, costs, or fees imposed upon or incurred by NaphCare as a proximate result of their negligence;

4.      For contractual indemnification from CHP pursuant to Section 4.2 of the agreement between NaphCare and CHP, including indemnity for all liability, damages, costs, and expenses, including reasonable attorney's fees, arising out of the negligent acts or omissions of CHP, its agents, officers, employees, or subcontractors;

5.      For a judicial declaration of the respective rights, duties, and obligations of NaphCare and Third-Party Defendants, including a determination of the proportion of liability, if any, of Third-Party Defendants for Plaintiff's alleged injuries;

6.      For costs of suit incurred herein;

7.      For reasonable attorney's fees to the extent permitted by law, contract, or equity; and

8.      For such other and further relief as the Court deems just and proper.

MANNING | KASS

1  DATED:  August 25, 2025          **MANNING & KASS**
2                                    **ELLROD, RAMIREZ, TRESTER LLP**
3
4                                    By:  _____*/s/ David L. Fleck*_____
5                                         Eugene P. Ramirez
6                                         Marguerite L. Jonak
7                                         David L. Fleck
                                          Attorneys for Defendant NaphCare, Inc.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MANNING | KASS

Case No. 3:24-cv-01687-W-DTF